# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 8, 2016     Decided November 18, 2016

No. 15-1059

AT&T CORP.,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

BANDWIDTH.COM, INC., ET AL.,
INTERVENORS

———

On Petition for Review of an Order of the Federal
Communications Commission

———

*Joseph Guerra*, argued the cause for petitioner. With him on the briefs were *Peter D. Keisler*, *James P. Young*, *Kwaku A. Akowuah*, *Gary L. Phillips*, and *David L. Lawson*.

*Sarah E. Citrin*, Counsel, Federal Communications Commission, argued the cause for respondents. On the brief were *William J. Baer*, Assistant Attorney General, *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, *Jonathan B. Sallett*, General Counsel, Federal Communications Commission, *David M. Gossett*, Deputy General Counsel, *Jacob M. Lewis*, Associate General Counsel, *Richard K.*

*Welch*, Deputy Associate General Counsel, and *Lisa S. Gelb*, Counsel. *James M. Carr*, Counsel, entered an appearance.

*Christopher J. Wright*, argued the cause for intervenors. With him on the brief were *John T. Nakahata*, *Timothy J. Simeone*, *Stephen W. Miller*, *Joshua M. Bobeck*, *Charles A. Zdebski*, and *Jeffrey P. Brundage*. *John R. Grimm* entered an appearance.

Before: ROGERS, *Circuit Judge*, and WILLIAMS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: This case arises from the ongoing transition of American telephony to the Internet. The process creates challenges to a regulatory system designed for the pre-Internet world, the familiar "public switched telephone network" or "PSTN." We deal here with the fees that local exchange carriers ("LECs") can charge inter-exchange carriers ("IXCs") for certain services they provide, in coordination with providers of Voice over Internet Protocol ("VoIP"), for the completion of "inter-exchange" calls. Resolution of the dispute turns on how the disputed services are to be classified. The Federal Communications Commission says that they are end-office switching services. Petitioner AT&T says that they are tandem switching services. The prescribed rates for the latter have generally been lower; AT&T has no objection to paying them.

Two decisions of the Commission are critical. First, in 2011 the Commission made a broad effort to update its system for regulating intercarrier compensation. *In re Connect America Fund*, 26 FCC Rcd. 17663 (2011) (the "*Transformation Order*"). That order produced definitions of

"End Office Access Service" and "Tandem-Switched Transport Access Service," stated in subsections (d) and (i), respectively, of 47 C.F.R. § 51.903. The parties focus on subsection (d), providing:

> *End Office Access Service* means:
>
> (1) The switching of access traffic at the carrier's end office switch and the delivery to or from of such traffic to the called party's premises;
>
> (2) The routing of interexchange telecommunications traffic to or from the called party's premises, either directly or via contractual or other arrangements with an affiliated or unaffiliated entity, regardless of the specific functions provided or facilities used; or
>
> (3) Any functional equivalent of the incumbent local exchange carrier access service provided by a non-incumbent local exchange carrier.

§ 51.903(d). Subsection (i), governing tandem switching access service, employs similar "functional equivalent" language.

The *Transformation Order* recognized that LECs partnered with VoIP providers to supply these services. It therefore specified that a LEC could collect for provision of access services "regardless of whether the [LEC] itself delivers such traffic to the called party's premises or delivers the call . . . via contractual or other arrangements with an affiliated or unaffiliated provider of interconnected VoIP service." § 51.913(b). In short, the *Transformation Order* allowed a VoIP provider and its LEC partner (collectively, "VoIP-LEC") to charge for providing the "functional equivalent" of end-office switching services, or tandem switching services, as the case might be.

In the second decision, *In re Connect America Fund*, 30 FCC Rcd. 1587, 1588, ¶ 2 (2015) (the "*Declaratory Ruling*"), the Commission wrestled with the contention of AT&T, an IXC, that the disputed services do *not* qualify as end-office access. The Commission ruled that the disputed services are indeed end-office access under subsection (3) of § 51.903(d). *Id*. at 1588-89, ¶ 3. It presented its ruling as an interpretation of the *Transformation Order*.

AT&T challenges the *Declaratory Ruling* on two grounds. First, it argues that the ruling cannot be upheld as an interpretation of the *Transformation Order*. On this issue we must uphold the Commission unless its proffered interpretation is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quotation omitted). If the *Declaratory Ruling* fails that test, then imposition of the fees would require a change in the Commission's rules, which could occur only through the usual notice-and-comment rulemaking under the Administrative Procedure Act, 5 U.S.C. § 553. In the end, we find that the *Declaratory Ruling* does not disclose the Commission's reasoning with the requisite clarity to enable us to sustain its conclusion. *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943); see *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). We therefore vacate and remand the order to the Commission for further explanation.

AT&T also contends that it was arbitrary and capricious of the Commission to apply its "interpretation" retroactively, thus requiring AT&T to pay end-office switching charges for access services it received before the *Declaratory Ruling*. On the view we take of the first claim, we need not reach this issue here.

5

\* \* \*

We now double back to describe the disputed services. We start with end-office and tandem switching in a pure PSTN environment, and then move to the services' respective places in the mixed universe of Internet and PSTN.

The PSTN depends on time-division multiplexing ("TDM") technology, which allows multiple calls to travel simultaneously over shared equipment before being separated onto individual lines. When a subscriber "originates" a long-distance call in the PSTN context, that call must travel from the subscriber's premises over the subscriber's line ("loop" in PSTN parlance) to an end-office switch, which will link the call to trunk lines, where it will travel in TDM format along with other conversations. For the called party, the process is similar, with an end-office switch moving the call from a trunk line to the subscriber's line, thus enabling the call to be terminated. (Termination doesn't refer to the end of the phone call, but to its reaching the called party.) The Commission has long regulated the rates for this access because of a risk that LECs would charge the IXCs monopolistic prices. See *In re Access Charge Reform, Seventh Report & Order*, 13 FCC Rcd. 9923, 9935-36, ¶¶ 30-34 (2001). A similar risk exists along the network of trunk lines running *between* the end-office switches for the calling and called parties. See *In re Access Charge Reform, Eighth Report & Order*, 19 FCC Rcd. 9108, 9116-17, ¶ 17 (2004). "Just as the loop runs from [customer premises] terminals to local switches, the trunks run from the local switches to centralized, or tandem, switches . . . , which operate much like railway switches, directing traffic into other trunks." *Verizon Communications, Inc. v. F.C.C.*, 535 U.S. 467, 490 (2002); see also *In re Access Charge Reform, First Report & Order*, 12 FCC Rcd. 15982, 16051, ¶ 158 (1997). The Commission regulates switching costs in this second context as well.

The Commission has set the ceiling on rates chargeable by a "competitive" LEC at the rates charged by the incumbent LEC with which it competes. (The incumbent LECs are mostly descendants of the "Baby BOCs"—the Bell Operating Companies that were split off from the old AT&T on the occasion of its break-up. The focus here is on competitive LECs, or "CLECS"; except as necessary we refer to the two interchangeably.) In the PSTN context, the chargeable switching rate depends on the function of the switching service. Thus, the Commission has said, the benchmark switching rate "is [1] the end office switching rate when a competitive LEC originates or terminates calls to end users and [2] the tandem switching rate when a competitive LEC passes calls between two other carriers." *In re Access Charge Reform, PrairieWave Telecomms., Inc. Petition*, 23 FCC Rcd. 2556, 2558, ¶ 6 (2008) (bracketed numbers added). In PSTN, then, end-office switching occurs between a trunk line and the subscriber's line, while tandem switching occurs between trunk lines.

Given their TDM heritage these access charges do not map cleanly onto VoIP-PSTN traffic, which the Commission defined in the *Transformation Order* as "traffic exchanged over PSTN facilities that originates and/or terminates in IP format." 26 FCC Rcd. at 18006, ¶ 940. There the Commission adopted the general principle that LECs could "charge the relevant intercarrier compensation for functions performed by it and/or by its retail VoIP partner, regardless of whether the functions performed or the technology used correspond precisely to those used under a traditional TDM architecture." *Id.* at 18026-27, ¶ 970. That focus on functions of course undergirds the reliance on "functional equivalent[s]" in § 51.903(d), (i).

The *Transformation Order* also explicitly asserted the application of its rules across technologies, saying that LECs

are entitled to compensation for performing functions "using, in whole or in part, technology other than TDM transmission in a manner that is comparable to a service offered by a local exchange carrier." 47 C.F.R. § 51.913(b).

To understand the application of that principle, and the present claims, we now must examine VoIP-PSTN services provided by a VoIP-LEC. The universe of these provider partnerships is divided into two—"facilities-based" and "over-the-top." *Declaratory Ruling*, 30 FCC Rcd. at 1588, ¶ 2. Facilities-based service occurs when a VoIP provider such as a cable company owns or leases the physical infrastructure connecting directly to subscribers' homes and offices and thus completes the "last mile" of the call. *Id.* at 1592, ¶ 11 n.35. This is closely parallel to the equivalent PSTN process; the charges levied by these providers are not at issue here.

Over-the-top VoIP providers do not connect directly to the last mile transmission network. *Id.* at 1588, ¶ 2. They "require the end user to obtain broadband transmission from a third-party provider." *Id.* at 1592, ¶ 11 n.35 (citation omitted). Thus, suppose a call from a PSTN calling party to an over-the-top VoIP subscriber. The call will make its way via the calling party's IXC to some intermediate point, at which the VoIP-LEC provider will "convert[] the call from TDM to IP format." *AT&T Corp. v. YMax Communications Corp.* 26 FCC Rcd. 5742, 5746, ¶ 7 (2011) ("*YMax I*"). Now taking the form of data packets, the call will then proceed over the Internet until it reaches the network of the called party's Internet service provider ("ISP"). *Id.* That ISP will then direct the data packets to the called party's customer premises equipment—which in *YMax I* were (perhaps typically) a VoIP device and a landline handset. See *id.* at 5744, 5746, ¶¶ 4, 7.

The Commission issued the *Declaratory Ruling* to resolve petitioner AT&T's contention that the *Transformation*

*Order* did not require it to pay over-the-top VoIP-LECs the end-office switching rate. 30 FCC Rcd. at 1594-95, ¶ 16. AT&T argued there, and argues here, that the *Transformation Order* authorizes LECs to obtain end-office switching charges *only* if they actually interconnect with the last-mile network leading into a customer's home, a condition satisfied in the PSTN world and by facilities-based providers in the IP world. *Id*.

AT&T bolstered the argument by reference to *RAO Letter 21*, 7 FCC Rcd. 5205 (1992), a staff document that identified eight "basic switching functions," *id*. at 5205 & n.1. One of these eight functions is "[i]nterconnection [which] connects subscriber line to subscriber line or subscriber line to trunk," while the remaining seven cover activities such as, "[a]ttending [which] monitors for off-hook signals," "[i]nformation receiving," and "[i]nformation transmitting." *Id*. at n.1. In 1997, the Commission clarified the letter by stating that out of the eight functions, "interconnection, *i.e.*, the actual connection of lines and trunks, is the characteristic that distinguishes [end-office] switches from other central office equipment." *In re Petition for Reconsideration, RAO 21*, 12 FCC Rcd. 10061, 10067, ¶ 11 (1997).

The *Declaratory Ruling* "recognize[d] that elements" of the *RAO* "decisions emphasize, among other things, the function of connecting lines and trunks in end-office switching," but dismissed arguments based on these decisions as "necessarily tied to TDM-based technologies." *Declaratory Ruling*, 30 FCC Rcd. at 1606, ¶ 38. It treated interconnection, formerly the *sine qua non* of end-office switching, as a mere technical exigency of TDM networks and not an inherent function of end-office switching. *Id*. at 1602, ¶ 30.

Instead the Commission selected from *RAO Letter 21* what it called an "aggregation of functions," specifically "call control, i.e., the functions necessary to ensure call set-up, conduct and take-down," and pronounced this the functional equivalent of end-office switching. 30 FCC Rcd. at 1601, ¶ 28 (emphasis omitted). Finding that over-the-top VoIP services "undoubtedly provide the call intelligence associated with call set-up, supervision and management" because these services "determine call destination and directly code the call for receipt and decoding by the called party," it concluded that over-the-top VoIP providers supply "the functional equivalent of end-office switching." *Id*. at 1602, ¶ 29 & n.105.

Its justification for the shift from interconnection rested in large part on a claim that the *Transformation Order* had ushered in a "new functional equivalence approach" that was not bound by "preexisting, technology-specific, TDM-based guidance for determining functional equivalency." 30 FCC Rcd. at 1600, ¶ 26 & n.98. This "new" approach, the *Declaratory Ruling* explained, requires a "holistic look at how calls are delivered to the end user" rather than a comparison of "key physical switching functions." *Id*. at 1600-1601, ¶¶ 26-27 (explaining that a test based on "physical functions" is too "narrow" an interpretation of the *Transformation Order*). The Commission rooted this new standard in a passage from the *Transformation Order* saying that the functions or technologies used "do not need to correspond precisely to those used under a traditional TDM architecture." 30 FCC Rcd. at 1600, ¶ 26 n.98 (quoting *Transformation Order*, 26 FCC Rcd. at 18026-27, ¶ 970) (internal quotation marks omitted). The Commission also found support for this approach in certain general statements the agency had previously made about functional equivalence, a concept with a long history in telecommunications regulation, which we need not recount here. See 30 FCC Rcd. at 1148, ¶ 27 n.100 (citing precedents); see also *id*. at 1150, ¶ 31 & n.114.

AT&T argues that the Commission misapplied this functional equivalence concept. As we saw, the *Declaratory Ruling* proclaimed the standard to be "new," to require a "holistic look at how calls are delivered to the end user," and not to require precise physical identity. But those propositions don't tell us much about what functional equivalence *does* mean. This seems to turn on a comparison of the functions performed by PSTN end-office switches and by over-the-top VoIP-LECs. The *Declaratory Ruling* said that those entities' provision of "call control" and call intelligence did the job. *Declaratory Ruling* at 1601, ¶ 28. This poses a key question: if those are the critical functions, what distinguishes end-office switching from tandem switching?

AT&T assails the Commission's failure to explain why the activities of over-the-top VoIP-LECs should be classified as end-office *rather than tandem switching*. "They [the VoIP-LEC partners] perform only some limited subset of the call control functions performed traditionally by *all types of switches*." Pet'r Br. at 10 (emphasis added). Indeed, AT&T had posed that problem in the proceedings leading to the *Declaratory Ruling*, clearly enough so that the Commission noted that it had argued that the services of the VoIP-LECs "'more closely resemble tandem switching' than end office switching." *Declaratory Ruling*, 30 FCC Rcd. at 1604, ¶ 33. Having explicitly noted AT&T's position, the *Declaratory Ruling* never again mentioned tandem switching. And at oral argument counsel for the agency was unable to point to any Commission language, in the *Declaratory Ruling* or elsewhere, indicating that call intelligence is not performed by tandem switches. Oral Argument at 32:06.

When the Commission applies the functional equivalence test, it necessarily draws a line around "the essential function[s]" of a service. See *In re Investigation of Special*

11

*Access Tariffs of Local Exchange Carriers*, 12 FCC Rcd. 7026, 7041, 7052, ¶¶ 27, 48 (1997) (explaining that under "functional equivalence test," services were not "like" when they failed to share an "essential function"); see *In re Cellexis Internat'l, Inc. v. Bell Atlantic NYNEX Mobile Sys., Inc.*, 16 FCC Rcd. 22887, 22894, ¶ 19 (2001) ("[I]t is the purpose of a technical configuration, not the configuration itself, that is relevant in determining functional equivalence."). The *Declaratory Ruling* held that "call control" was the essential, defining purpose of end-office switching while "interconnection" was not. 30 FCC Rcd. at 1601-1602, ¶¶ 28-30 (defining call control as "the intelligence associated with call set-up, supervision and management"). AT&T contends that this defining function is not defining at all. As we mentioned above, AT&T asserts that over-the-top VoIP-LECs "perform only some limited subset of the call control functions performed traditionally by all types of switches." Pet'r Br. at 10.

Indeed, the *Declaratory Ruling* never explained its references to call set-up and the intelligence associated with it. But in prior rulings the Commission had repeatedly referred to "call set-up" in terms that seem to encompass the services of tandem switches, e.g., speaking of it as the process of "establish[ing] transmission paths over which telephone calls are carried." *In re Ameritech Operating Cos.*, 11 FCC Rcd. 3839, 3841, ¶ 4 (1996). Call set-up determines the route necessary to get from the calling party's phone to the called party's phone. In a TDM phone call, this route is determined by a signaling network, such as the SS7 network. *In re High-Cost Universal Serv. Support*, 24 FCC Rcd. 6475, 6642, ¶ 327 n.848 (2008) ("SS7 is an out-of-band signaling system that is separate from, but runs parallel to, the public switched telephone network (PSTN) and is used to set up call paths between calling and called parties."); *In re Access Charge Reform, First Report & Order*, 12 FCC Rcd. 15982, 16087,

¶ 244 (1997) ("[S]ignaling networks like SS7 establish and close transmission paths over which telephone calls are carried."); see generally *Transformation Order*, 26 FCC Rcd. at 17892-96, ¶¶ 708, 715-17 (discussing different types of signaling networks, including SS7, Multi-Frequency signaling, and IP signaling).

In the most common type of signaling network, the call set-up process relies on databases: "[S]witch[es] [] send queries . . . to call-related databases, which return customer information or instructions for call routing to the switch." *In re Application of GTE Corp.*, 15 FCC Rcd. 14032, 14121, ¶ 189 n.431 (2000). Thus the "intelligence associated with call set-up" exists not in end-office switches, but in these "call-related databases." To the extent that end-office switches possess any of the "intelligence associated with call set-up," that intelligence appears to be shared with tandem switches. Both end-office and tandem switches are, for signaling purposes, "service switching points . . . capable of originating, transmitting, and receiving SS7 messages for call set-up and database transactions." *Ameritech*, 11 FCC Rcd. at 3840-41, ¶ 3; see *In re Access Charge Reform, First Report & Order*, 12 FCC Rcd. at 16045, ¶ 145 (indicating that both end-office and tandem switches "process or formulate signal information").

Because both tandem and end-office switches process "intelligence associated with call-setup," the *Declaratory Order*'s functional equivalence analysis fails to distinguish between them. If end-office switches traditionally perform functions A (call set-up) and B (interconnection between trunks and loops), while tandem switches perform functions A (call set-up) and C (interconnection between trunks), it is wholly arbitrary to say (without more) that the call set-up activity of VoIP-LECs is the functional equivalent of end-office switching but (implicitly) *not* the equivalent of tandem

switching. Which is it—one, the other, or both? And what language in the *Transformation Order* gives the answer?

The *Transformation Order* prescribed entirely different consequences for services that are the functional equivalent of end-office switching and of tandem switching. Besides assigning them separate definitions, see 47 C.F.R. § 51.903(d), (i), it provided for different rate ceilings. Compare 47 C.F.R. § 51.907(g)(1) (end-office access service) with *id*. § 51.907(g)(2) (tandem switch service). In case the *Transformation Order*'s rules did not insist on the distinction between them clearly enough, the Commission drew a picture, illustrating the two types of switching as occurring separately at different stages of a call's path. Figure 13, 26 FCC Rcd. at 18112, ¶ 1306. So far the Commission has not pointed to anything in the *Transformation Order* from which a reader would understand that it meant for specific services provided by over-the-top VoIP-LEC providers to qualify as the functional equivalent of end-office switching and not tandem switching.

The Commission's muddled treatment of functional equivalence requires vacatur and remand. But judicial economy suggests that we address some of AT&T's other arguments to avoid re-litigation of identical issues in a subsequent petition. AT&T claims that language in the *Transformation Order* itself, and in Commission decisions before and after the ruling, illustrate that references to end-office switching services cannot be read as broadly as necessary to sustain the *Declaratory Ruling*.

In the preamble to the *Transformation Order* (the "concise general statement of [the rules'] basis and purpose" required by 5 U.S.C. § 553(c)), the Commission explained that it was adopting rules to make clear that a carrier may impose origination and termination charges when it "uses

Internet Protocol facilities to *transmit . . . traffic to or from the called party's premise*s." 26 FCC Rcd. at 18025, ¶ 969 (emphasis added) (brackets omitted). It went on to say, "[O]ur rules do not permit a LEC to charge for functions performed neither by itself or its [VoIP] partner." *Id*. at 18027, ¶ 970. On their face these passages seem to deny an over-the-top provider authority to charge end-office switching rates. As we've pointed out, the Commission acknowledged that VoIP providers do not supply a last-mile connection and their end-users must obtain broadband transmission from others.

The Commission replies that the passage is "not itself a rule," so that the Commission is free to deviate from its apparent meaning. Resp. Br. at 21-22. But at the very least, an agency's "expla[nation] in the Federal Register" provides evidence of the agency's "intent at the time of the regulation's promulgation." *Consolidation Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 136 F.3d 819, 821-22 (D.C. Cir. 1998) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). An interpretation at odds with the agency's expressed intent at the time of adoption enjoys no judicial deference. *Comcast Cable Communications, LLC v. F.C.C.*, 717 F.3d 982, 1003 (D.C. Cir. 2013).

The Commission also contends that the preamble language is ambiguous; its theory for ambiguity is that most IXCs other than AT&T mutely paid the charges when billed by the VoIP-LECs. Parties' silent decisions not to incur the cost of litigation seem a relatively remote basis for claiming ambiguity, which in common parlance is a matter of language. Nonetheless, the *Transformation Order* might conceivably have been using "transmit" in the sense of helping to cause another party to make the ultimate transmission.

AT&T also cites two decisions relating to YMax Communications Corp., an over-the-top VoIP provider. In the first, *AT&T Corp. v. YMax Communications Corp.* 26 FCC Rcd. 5742 (2011) ("*YMax I*"), which we've already mentioned, AT&T successfully resisted YMax's claim to end-office switching fees. The pure holding of *YMax I* was narrow: that an over-the-top VoIP provider could not levy end-office switching charges based on a tariff that described end-office switching purely in TDM terms. "The fundamental problem [with YMax's position] appears to be that YMax chose to model its Tariff on common language in LEC access tariffs, even though the functions YMax performs are very different from the access services typically provided by LECs." *YMax I,* 26 FCC Rcd. at 5748, ¶ 14. Relying on the tariff's references to "End User station loops" and "end user lines"—language drawn from the TDM world—the Commission found that the tariff contemplated charges only for TDM services. *Id*. at 5755-59, ¶¶ 36-45. And under the filed rate doctrine YMax could charge only for services specified in the tariff. *Id*. at 5748, ¶ 12 (quoting 47 U.S.C. § 203(a), (c)).

In addition to its holding on YMax's tariff language, the Commission hinted that YMax's access charges might have failed to satisfy the functional equivalence standard but stopped short of addressing that issue. 26 FCC Rcd. at 5743, ¶ 1 n.7 ("[W]e emphasize that this Order addresses only the particular language in YMax's Tariff and the specific configuration of YMax's network architecture . . . .").

The Commission also refused to "address issues regarding the intercarrier compensation obligations, if any, associated with [VoIP] traffic in this Order." *Id*.

The Commission cited *YMax I* with a "cf." signal in the *Transformation Order*, 26 FCC Rcd. at 18027, ¶ 970 n.2028,

and AT&T reads the citation as intended to illustrate that the services of an over-the-top VoIP do not qualify for end-office switching fees. The Commission insists here, as it did in the *Declaratory Ruling*, that the citation served merely as "part of a discussion of measures taken to prevent double billing." 30 FCC Rcd. at 1604, ¶ 34 n.126. The evidence is mixed, but we find the Commission's interpretation reasonable.

After the *Transformation Order* another matter involving YMax led the Commission's Wireline Competition Bureau to amend one of the order's rules. Shortly after the order was published, YMax sought "confirmation of its interpretation" that it need only provide "some portion of the interconnection with the PSTN" to qualify for the "full benchmark rate" of access charges, "even if [the rate] includes functions that neither [the LEC] nor its VoIP retail partner are actually providing." *In re Connect America Fund*, 27 FCC Rcd. 2142, 2144, ¶ 4 (2012) ("*YMax II*"). The Bureau noted that YMax's request "highlight[ed]" a potential conflict between two of the *Transformation Order*'s rules. See *id.* at 2144, ¶ 5. While 47 C.F.R. § 51.913(b) prevents VoIP-LECs from "charg[ing] for functions not performed by the [LEC] itself or the . . . VoIP" provider, the *Transformation Order* amended 47 C.F.R. § 61.26(f) to provide an apparently much laxer standard:

> If a CLEC provides *some portion* of the switched exchange access services . . . [and] if the CLEC is listed in the database of the Number Portability Administration Center as providing the calling party or dialed number, the CLEC may assess a rate equal to the rate that would be charged by the competing ILEC *for all exchange access services* required to deliver interstate traffic to the called number.

*Transformation Order*, 26 FCC Rcd. at 18226 (emphasis added) (amending § 61.26(f)). Thus, as YMax argued,

§ 61.26(f) seemed to allow carriers to bill for services not provided, as long as they performed "some portion" of the total services required to deliver a call. The Bureau rejected YMax's interpretation of § 61.26(f) on the grounds that it could lead to "double billing"; it amended the rule to make clear that § 61.26(f) "is limited by section 51.913(b)." *YMax II*, 27 FCC Rcd. at 2144, ¶¶ 4-5; see *id*. at 2149 (amending § 61.26(f) with the qualifier "to the extent permitted by § 51.913(b)").

AT&T asks us to read *YMax II* in light of both YMax's letter to the Bureau and its filings in *YMax I*, which the Bureau did not cite. AT&T assumes that the Bureau read the "some portion" phrase in YMax's letter as a specific reference to all the capabilities, including call control, that YMax had detailed in prior filings to the Commission. From this AT&T claims that "it is inconceivable that the Bureau would have denied" YMax's request if the *Transformation Order* allowed a charge for end-office switching services merely on the basis of a VoIP-LEC's providing call control. Pet'r Br. at 33-34. We find the argument a stretch. It is just as likely that the Bureau interpreted "some portion" to mean unspecified functions falling short of "call control."

While neither *YMax* decision is a holding in favor of AT&T's view, *YMax I* represents the Commission's apparent understanding of the "commonly understood meaning[]" of end-office switching around the time of the *Transformation Order*. See *YMax I*, 26 FCC Rcd. at 5758, ¶ 43. The Commission was remarkably clear, even emphatic, in its statement about end-office switching. Charges for such switching, it said, "are authorized by law to allow local exchange carriers to recover the substantial investment required to construct the tangible connections between themselves and their customers throughout their service territory." *Id*. at 5757, ¶ 40 & n.117. It therefore presents an

additional problem with the Commission's attempted application of the *Transformation Order*'s functional equivalence standard, besides the ones already discussed.

Here we note that the *Declaratory Ruling* also falls down in its effort to explain why VoIP-LECs' failure to provide interconnection is not fatal to the claim that they provide the functional equivalent of end-office switching. As we saw, the *RAO* guidance and *YMax I* both appear to identify end-office switching as supplying actual or physical interconnection. See *id*. Indeed, the *Declaratory Ruling* acknowledged that interconnection is "critical" to end-office switching in a TDM call, but found that it was "not require[d]" in VoIP-PSTN calls. 30 FCC Rcd. at 1602, ¶ 30. The ruling's only explanation for why interconnection is "not require[d]" is that, in VoIP-PSTN calls, "the customer is separately paying for [the] broadband connection, which interconnects" the call. *Id*. That the customer is paying for the broadband interconnection doesn't support the conclusion that interconnection is unnecessary for end-office switching—it merely indicates that it is provided by a party other than a VoIP-LEC. Even assuming that the *Transformation Order* cast off interconnection as a remnant of "preexisting, technology-specific, TDM-based guidance for determining functional equivalency," *Declaratory Ruling*, 30 FCC Rcd. at 1600, ¶ 26 n.98, that reading would still require the Commission to provide some distinctive "functional equivalence" criterion in its place. On the record before us, the Commission has not done so.

The *Declaratory Ruling* is accordingly

*Vacated and remanded.*